**No. 23-2221**
**(2:20-cv-02517-DCN)**

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

_____

PENNY JO BARNETT, Individually and as the
Personal Representative of the Estate of
Edward Barnett,

_Plaintiff-Appellant_

v.

UNITED STATES OF AMERICA

_Defendant-Appellee_

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA, CHARLESTON DIVISION

_____

## APPELLANT'S OPENING BRIEF

_____

Brooklyn A. O'Shea
Christopher J. McCool
O'Shea Law Firm, LLC
1120 Folly Road
Charleston, SC 29412
(843) 805-4943

Jordan Calloway
McGowan, Hood, Felder & Phillips, LLC
1539 Health Care Drive
Rock Hill, SC 29732
(803) 327-7800

Attorneys for Appellant

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 23-2221          Caption: Barnett v. USA

Pursuant to FRAP 26.1 and Local Rule 26.1,

Penny Jo Barnett, individually, and as PE of the Estate of Edward Banett
(name of party/amicus)


who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?      ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?      ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?      ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Jordan C. Calloway

Date: December 6, 2023

Counsel for: Appellant

Print to PDF for Filing

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………… iv

JURISDICTIONAL STATEMENT…………………………………. 1

STATEMENT OF THE ISSUES ON APPEAL……………………… 2

STATEMENT OF THE CASE………………………………………. 3

    A. The contraction dike's lighting system was established,
       installed, and maintained by the Government…………………. 3

    B. Mr. Barnett encountered a poorly-lit, confusing lighting
       system as he approached the dike on July 6, 2018…………….. 5

    C. Barnett's negligence claims seek damages suffered as a
       result of her husband's death………………………………….. 7

ARGUMENT SUMMARY……………………………………………. 9

STANDARD OF REVIEW……………………………………….. 12

ARGUMENT ……………………………………………………… 12

    1. The district court erred in invoking the Discretionary
       Function Exception to immunize the Government for
       many of its maintenance and operational errors...........................12

    2. The district court erroneously concluded the Government
       did not breach its duty to maintain the contraction dike's
       lighting system……………………………………………………17

    3. The district court's causation analysis failed to consider the full
       scope of the Government's negligence and improperly applied
       key fault allocation principles…………………………………..25

       a. Any negligence by Mr. Barnett is not the extraordinary,
         unforeseeable intervening act required to qualify as a
         superseding cause…………………………………………….25

   b.  The district court misapplied the rules from *The Pennsylvania* and *The Oregon*…………………………………29

      i.    Barnett rebuts the *Oregon* presumption…………………30

     ii.   The *Pennsylvania* Rule should not apply to Barnett……..32

    iii.   The Pennsylvania Rule applies to the Government……....33

  4.  Barnett's post-trial motions did not revive the Government's right to pursue costs that it waived by failing to make a timely filing …………………………………………………...37

  5.  The district court erred in refusing to take judicial notice of a Coast Guard publication…………………………………………...42

CONCLUSION…………………………………………………....44

REQUEST FOR ORAL ARGUMENT…………………………...45

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

*American Telephone & Telegraph. Co. v. Steuart Transportation Co.*,
    1978 A.M.C. 1680 (D. Md. 1977)...……………………………………..31

*American Zinc Co. v. Foster*,
    313 F. Supp. 671 (S. D. Miss.1970).........................................................35

*Anderson v. City of Bessemer City, North Carolina*,
    470 U.S. 564 (1985)................................................................................12

*Bailey v. County of Riverside*,
    414 F.3d 1023 (9th Cir. 2005)................................................................38

*Bunge Corp. v. Freeport Marine Repair*,
    240 F.3d 919 (11th Cir. 2001)................................................................29

*Butts v. U.S.*,
    930 F.3d 234 (4th Cir. 2019)..................................................................12

*Callas' Estate v. U.S.*,
    682 F.2d 613 (7th Cir. 1982)............................................................14, 22

*China Union Lines, Ltd. v. A. O. Andersen & Co.*,
    364 F.2d 769 (5th Cir. 1966)..................................................................30

*Commercial Transport Corp. v. Martin Oil Service, Inc.*,
    374 F.2d 813 (7th Cir. 1967)............................................................32, 33

*Compania de Maderas de Caibarien, S. A. v. The Queenston Heights*,
    220 F.2d 120 (5th Cir. 1955)..................................................................30

*Curtis Bay Towing Co. v. The M/V Maryland Clipper*,
    599 F.2d 1313 (4th Cir. 1979)................................................................25

*CX Reinsurance Co. v. Johnson*,
    977 F.3d 306 (4th Cir. 2020)............................................................38, 39

*Donovan v. Red Star Marine Services, Inc.*,
739 F.2d 774 (2d Cir. 1984).....................................................43

*Equinor USA Onshore Properties, Inc. v. Pine Resources, LLC*,
917 F.3d 807 (4th Cir. 2019)...................................................12

*Evanston Insurance Co. v. AmSpec Holding Corp.*,
495 F. Supp. 3d 485 (S.D. Tex. 2020)....................................43

*Evergreen International, S.A. v. Norfolk Dredging Co.*,
531 F.3d 302 (4th Cir. 2008)...................................................17

*Exxon Co., USA v. Sofec, Inc.*,
517 U.S. 830 (1996)................................................................25

*Faust v. U.S.*,
721 F.2d 934 (4th Cir. 1983)...................................................22

*Huber v. United States*,
838 F.2d 398 (9th Cir. 1988)...................................................13

*Hurd v. United States*,
134 F. Supp. 2d 745 (D.S.C. 2001).........................................13

*Indian Towing Co. v. U.S.*,
350 U.S. 61 (1955)......................................................18, 21, 22

*In re Wasson*,
495 F.2d 571 (7th Cir. 1974)...................................................35

*Inter-Cities Navigation Corp. v. United States*,
608 F.2d 1079 (5th Cir. 1979).................................................30

*Interstate Natural Gas Co. v. Southern California Gas Co.*,
209 F.2d 380 (9th Cir. 1953)...................................................43

*Jackson v. City of Columbus*,
197 F.3d 77 (6th Cir. 1999).....................................................42

*Mack v. South Bay Beer Distributors, Inc.*,
    798 F.2d 1279 (9th Cir. 1986)..............................................................43

*Magno v. Corros*,
    630 F.2d 224 (4th Cir. 1980)................................................17, 20-22, 24

*Marlys Bear Medicine v. U.S. ex rel. Sec'y of Dep't of Interior*,
    241 F.3d 1208 (9th Cir. 2001)..............................................................13

*Martin v. Harris*,
    560 F.3d 210 (4th Cir. 2009)................................................................12

*Massachusetts v. Westcott*,
    431 U.S. 322 (1977)..............................................................................43

*Matter of Complaint of Foss Maritime Co.*,
    114 F. Supp. 3d 452 (W.D. Ky. 2015)..................................................33

*Orange Beach Water, Sewer, & Fire Protection Authority v. M/V Alva*,
    680 F.2d 1374 (11th Cir. 1982).......................................................30, 35

*Pan-Alaska Fisheries, Inc. v. Marine Construction & Design Co.*,
    565 F.2d 1129 (9th Cir. 1977)..............................................................25

*Parker Brothers & Co. v. De Forest*,
    221 F.2d 377 (5th Cir. 1955)................................................................30

*Parker Towing Co. v. Yazoo River Towing, Inc.,*
    794 F.2d 591 (11th Cir.1986)...............................................................32

*Patentas v. U.S.*,
    687 F.2d 707 (3d Cir. 1982).................................................................22

*Phillips v. Pitt County Memorial Hospital*,
    572 F.3d 176 (4th Cir. 2009)................................................................42

*Pioneer Investment Services Co. v. Brunswick Associates. Limited Partnership*,
    507 U.S. 380 (1993).......................................................................40, 41

*Rawl v. U.S.*,
  778 F.2d 1009 (4th Cir. 1985)...................................................26, 27

*Robinson v. Wix Filtration Corp., LLC*,
  599 F. 3d 403 (4th Cir. 2010)...............................................40

*Schumacher v. Cooper*,
  850 F. Supp. 438 (D.S.C. 1994)............................................18

*Shipes v. Piggly Wiggly St. Andrews, Inc.*,
  238 S.E.2d 167 (S.C. 1977)...................................................18

*Sunderland Marine Mutual Insurance Co. v. Weeks Marine Construction Co.*
  338 F.3d 1276, 1279 (11th Cir. 2003)....................................32

*Superior Construction. Co. v. Brock*,
  445 F.3d 1334 (11th Cir. 2006)..........................................29, 32

*The Oregon*,
  158 U.S. 186 (1895)........................................................25, 29-32

*The Pennsylvania*,
  86 U.S. 125 (1873).............................................................29-35

*Thompson v. E.I DuPont de Nemours & Co., Inc.*,
  76 F.3d 530 (4th Cir. 1996).................................................39-41

*Tidewater Marine, Inc. v. Sanco International, Inc.*,
  113 F. Supp. 2d 987 (E.D. La. 2000)....................................26, 28

*U.S. ex rel. Dingle v. BioPort Corp.*,
  270 F. Supp. 2d 968 (W.D. Mich. 2003)...............................42

*U.S. v. Reliable Transfer Co., Inc.*,
  421 U.S. 397 (1975)...........................................................25

*U.S. v. United States Gypsum Co.*,
  333 U.S. 364 (1948)...........................................................12

*Vollmar v. O.C. Seacrets, Inc.,*
    831 F. Supp. 2d 862 (D. Md. 2011)..........................................................28

*Weinstock v. Cleary, Gottlieb, Steen & Hamilton,*
    16 F.3d 501 (2d Cir. 1994)..................................................................40

## STATUTES AND REGULATIONS

14 U.S.C. § 102....................................................................................33-36

28 U.S.C. § 1291......................................................................................1

28 U.S.C. § 1333(1)..................................................................................1

28 U.S.C. § 2680(a)................................................................................13

62 C.F.R. § 62.21(f)...............................................................................14

62 C.F.R. § 62.21(g)..........................................................................14, 15

## COURT RULES

D.S.C. Local Rule 54.03......................................................................37, 39

Fed. R. App. P. 4(a)(1)(B)........................................................................1

Fed. R. Civ. P. 6(b)(1).......................................................................37, 39

Fed. R. Civ. P. 52(b).........................................................................37, 38

Fed. R. Civ. P. 54(d)(2)(B)......................................................................37

Fed. R. Civ. P. 58(b)(1)...........................................................................38

Fed. R. Civ. P. 59(e).........................................................................37, 38

Fed. R. Civ. P. 60(b).........................................................................37, 38

Fed. R. Evid. 201....................................................................................42

## SECONDARY SOURCES

1 T. Schoenbaum, Admiralty and Maritime Law § 5-3 (2d ed. 1994)...............26

Restatement (Second) of Torts § 323.................................................................22

Restatement (Second) of Torts § 442.................................................................27

# JURISDICTIONAL STATEMENT

This case asserts claims by Appellant Penny Jo Barnett ("Barnett") on behalf of herself and the Estate of her husband, Edward Barnett, arising from fatal injuries Mr. Barnett suffered in an allision of the vessel Miss June with a contraction dike in the Cooper River. Barnett's admiralty claims were properly before the district court in its admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1). (JA 13). Barnett timely filed a Notice of Appeal. (JA 307); *see also* Fed. R. App. P. 4(a)(1)(B). The district court's Findings of Fact and Conclusions of Law and entry of judgment are a "final decision" of the district court, and this court has jurisdiction over the appeal. 28 U.S.C. § 1291.

1. Whether the district court erred in granting sovereign immunity by applying the Discretionary Function Exemption to bar Barnett's negligence claims relating to candela, background lighting, flashing lights, and flash sequencing;

2. Whether the district court erred in concluding the United States ("Government") met the standard of care for its voluntarily undertaken duty to establish, maintain, and operate the Yellow/Amber ATONs, ATON 49, and ATON 49A;

3. Whether the district court erred in limiting its causation analysis to the Government's duty to maintain the dike's navigational aid closest to the shore;

4. Whether the district court erred in finding Mr. Barnett's operation of the Miss June outside the navigable channel was a superseding cause when a vessel leaving the channel was foreseeable, and the Government admits notice of injuries and deaths from allisions with the dike;

5. Whether the district court erred in its application of the Oregon and Pennsylvania Rules;

6. Whether the district court erred in granting the Government's untimely Motion for Leave to File a Bill of Costs; and

7. Whether the district court erred in denying Barnett's Motion for Judicial Notice.

# STATEMENT OF THE CASE

Barnett lost her husband in a preventable incident involving a dangerous Government-maintained dike that had long posed dangers to passing boaters. This appeal seeks review of the district court's conclusions on the scope of the Government's potential liability, the reasonableness of its conduct, and the effect of Mr. Barnett's actions on the night he died.

### A. The contraction dike's lighting system was established, installed, and maintained by the Government.

The United States Army Corps of Engineers ("USACE") originally constructed the subject contraction dike in the 1950s (and rebuilt it in 1999) on the Cooper River near the Federal Law Enforcement Training Center in North Charleston, South Carolina. (JA 411, JA 812, JA 1341). While a contraction dike may serve an important function, the Government recognizes it is a potential hazard that must be sufficiently marked and included on navigational charts issued by National Oceanic and Atmospheric Administration ("NOAA") for the benefit of boaters traveling along the river. (JA 498).

USACE and the United States Coast Guard installed a system of warning lights along and around the 750-foot-long dike. (JA 1354). A green flashing Coast Guard Aid to Navigation known as Light 49A is affixed to the dike's eastern tip. (JA 355-356, JA 1341). Motivated at least in part by past allisions with the dike, USACE and the Coast Guard installed three amber lights on the dike in 2006-07. (JA 1629)

and replaced/installed two of the lights in 2011 pursuant to a Private Aids to Navigation Application permit (JA 1331, JA 1627-1628). The eastern most of these lights ("Amber Light East") was approximately 200 feet from the dike's eastern edge, the center light ("Amber Light Center") sits 200 feet to the west (i.e. closer to shore), and the western most light ("Amber Light West") was an additional 200 feet to the east, just 130 feet from the shoreline. (JA 454).



In 2011, the USACE's Private Aids to Navigation Application regarding the lights affixed to the dike noted "NECESSITY FOR AID: … REQUIRED TO MARK CONTRACTION DIKE." (JA 1331). Each of these lights functioned as an

"aid to navigation," a term referencing a device "specifically intended to assist navigators in determining their position or safe course, or to warn them of dangers or obstructions to navigation." (JA 1429). Coast Guard personnel admit the lights' overarching purpose and the need to maintain them in good working order because "[t]hese lights are vital to the safety of our mariners." (JA 1628). The Coast Guard's mission is to administer, operate, and maintain the aids to navigation system (JA 1388) by ensuring all hazard warning signals (e.g. lights, signs, buoys, etc.) are functioning properly. (JA 1286).

## B. Mr. Barnett encountered a poorly-lit, confusing lighting system as he approached the dike on July 6, 2018.

During the nighttime hours of July 6, 2018, Mr. Barnett was operating a private 24-foot aluminum workboat known as the Miss June along the Daniel Island Bend on the Cooper River when he allided with the dike. Mr. Barnett suffered fatal injuries in the incident and was never able to describe what he saw. However, first responders and other witnesses present that night described the area around the dike as dark and confusing. Firefighters called the lighting "crappy," "dark," "unlit," and "bad." (JA 372-373, JA 1689-1692). Mr. Barnett's coworker (Robert Murphy) testified that the overall lighting at the dike was "pathetic" and "unacceptable" with any light emanating from the dike too dim and indistinguishable from background lighting in the area to effectively warn boaters of the dike's presence. (JA 373-374,

JA 759-761, JA 1681). Even Mr. Barnett's supervisor later told Government investigators the dike "was not well lit." (JA 374, JA 735, JA 1683).

A Coast Guard investigation of the allision found Amber Light West was inoperable (JA 55, JA 426-427, JA 1341) and neither Amber Light Center nor Amber Light East were included on the NOAA navigational charts. (JA 56). The same investigation included reports from witnesses suggesting multiple lights at the dike were not visible due to insufficient candela and/or on shore background lighting (JA 373-374). The investigation further noted the green Light 49A and Light 49 (a green-lighted buoy in the Cooper River 250 yards from Light 49A) were flashing at the same speed, another source of confusion for boaters. (JA 895, JA 1271, JA 1342).

The post-allision reports were consistent with pre-allision warnings. Weeks before Mr. Barnett's death, a boater—who herself had lost a relative to an allision with the dike—notified USACE that none of the dike's amber lights were visible to approaching boaters. (JA 335-336). According to Coast Guard Auxiliary member Dwaine Harris, this dike had long been a hot spot for danger. (JA 488). There had been an allision with the dike just 14 months earlier and multiple allisions at the site in prior years. (JA 372). The Government admits it was on notice of previous fatal allisions at this dike (JA 31) and, dating back to 2006, there were concerns within the Government about incidents at the dike and related legal liability. (JA 1629). Coast Guard employee Andrew Mark Engle testified that the dike "absolutely" was

a danger to boaters before the Barnett allision and remained so afterwards (JA 973). The Coast Guard was actively investigating another nighttime allision at the dike even as this case went to trial. (JA 383). David Merrill, a 43-year Coast Guard employee in uniform and as a civilian, noted in an email that "one thing for sure is if people keep running into it, we are going to get our ass handed to us in court." (JA 1252, JA 1307).

### C. Barnett's negligence claims seek damages suffered as a result of her husband's death.

Barnett, individually and on behalf of her husband's estate, brought this wrongful death and survival action alleging the Government created a hazardous condition at the dike, failed to inspect, maintain, and operate its aids to navigation, and failed to reasonably warn boaters of the serious danger the dike posed. (JA 18-19). Barnett's claims were tried by the district court in a December 2021 bench trial. On January 10, 2023, the district court issued its Findings of Fact and Conclusions of Law ruling the Government was not negligent in lighting or maintaining the dike. (JA 84-124). The district court entered judgment in the Government's favor on February 7, 2023. (JA 126).

Barnett filed a timely Post-Trial Motion on March 7, 2023. (JA 127). Several months later, the Government filed a Motion for Leave to File a Bill of Costs. (JA 247-250). A hearing never took place on either motion. On October 25, 2023, the district court denied Barnett's Post-Trial Motion and granted the Government leave

to file a bill of costs. (JA 258). The Government then filed a Bill of Costs on October 30, 2023. (JA 268). Barnett timely filed a Notice of Appeal on November 20, 2023. (JA 307).

# ARGUMENT SUMMARY

Mr. Barnett was killed when the workboat he was driving struck a Government-maintained contraction dike jutting over 700 feet into the Cooper River during a nighttime run near his employer's dock. Mr. Barnett was not the first to die in an allision with this dike and he would not be the last. The Government, through the Coast Guard and USACE, had installed a series of amber and green lights on the dock for safety purposes, but the system was poorly maintained and dysfunctional on the night Mr. Barnett died. One of the lights was burned out and others were imperceptible because they were too dim and too similar to lights on the shore behind them. Taken as a whole, multiple witnesses on the scene described the lighting system as inadequate and confusing.

The district court's ruling in the Government's favor on Barnett's negligence-based wrongful death and survival claims contains several legal errors. For one, the district court improperly narrowed the scope of Barnett's claim by incorrectly granting the Government immunity for most of the lighting system's deficiencies. While the district court correctly recognized the Government had regulation-mandated duties to address the lighting system's deficiencies, it incorrectly cast aside any claim for negligent maintenance of the dike's green lights (Light 49A/49) and the brightness and perceptibility of its amber lights.

The district court shrunk Barnett's claim even further in its breach analysis—considering only whether the Government was negligent in maintaining the amber light that was admittedly burned out. In finding that even that maintenance error was not unreasonable, the district court overlooked overwhelming evidence from eyewitnesses to conclude the dike remained "well lit." The breach analysis was also flawed in its examination of this court's precedent (*Magno*), reasoning that Barnett was attempting to expand the Government's lighting system when her claims were actually focused on deficiencies in the existing system the Government had undertaken.

Despite its views on duty and breach, the district court grounded its ultimate ruling on the mistaken notion that Barnett failed to prove causation. The district court first ruled Mr. Barnett's deviation from the river's navigational channel and the fact that he was not using a GPS device made his conduct a superseding cause of the allision. But, Mr. Barnett's conduct was not the type of extraordinary, unforeseeable intervening force that could sever the link between the Government's poorly maintained lighting system and the allision.

Rather than expanding the superseding cause doctrine beyond its recognized bounds, the district court should have applied the long-standing pure comparative fault rule for admiralty cases to compare and apportion the parties' relative level of fault. The district court's comparative fault analysis included what it admitted was

an unusual application of *The Oregon* rule that overlooked evidence showing this allision does not happen without deficiencies in the statutory object (i.e. the dike). Unprompted by Government arguments, the district court also applied *The Pennsylvania* rule but again failed to recognize the statutory violations here lie with the Government's mismanagement of the dike's lighting system. Deeming the Government wholly faultless for the allision does not align with the law or evidence.

Finally, the Government was permitted without cause to file a late Bill of Costs despite waiving any such right to by failing to make a timely filing. The Government admits missing its deadline, measured in the federal and local procedural rules from the date of "entry of judgment." This court's ruling on the effect post-trial motions can have on when "entry of judgment" occurs (*CX Reinsurance*) does not render the Government's filing timely because its delay in filing had already waived the right to costs *before* Barnett filed her post-trial motions. The district court's alternative ruling—that the Government had shown its delay was the product of "excusable neglect"—was made in a single sentence that did not consider any of the key factors for that analysis. Moreover, a Government attorney's misunderstanding of the rules is not excusable, and Barnett should not be responsible for the nearly $10,000 in costs the Government has claimed.

## STANDARD OF REVIEW

This Court applies a "mixed standard of review" to judgment following a bench trial with legal conclusions reviewed *de novo* and factual findings reversed if clearly erroneous. *Butts v. U.S.*, 930 F.3d 234, 238 (4th Cir. 2019) (citing *Equinor USA Onshore Properties, Inc. v. Pine Res., LLC*, 917 F.3d 807, 813 (4th Cir. 2019)). To the extent the Court finds the disputed portions of the district court's ruling implicates factual findings, the applicable "clearly erroneous" standard "is not toothless." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-74 (1985). A finding of fact is clearly erroneous where, although there is evidence to support it, the reviewing court "on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson*, 470 U.S. at 573 (quoting *U.S. v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). In an admiralty case, questions of negligence, including causation, are factual issues and are thus reviewed under the clearly erroneous standard. *Martin v. Harris*, 560 F.3d 210, 217 (4th Cir. 2009).

## ARGUMENT

1. **The district court erred in invoking the Discretionary Function Exception to immunize the Government for many of its maintenance and operational errors.**

    Barnett's negligence claim is based on numerous flaws in the lighting system the Government undertook for the contraction dike where the allision occurred. The

district court cited the Discretionary Function Exception ("DFE") to avoid addressing the merits of most of the system's errors. (JA 99). However, as the district court acknowledged, whether the Government adequately maintained lights or other aids to navigation on the dike does not qualify for the DFE. (JA 101-102). Therefore, the flaws in Lights 49A/49 and flaws in the candela and perceptibility of Amber Lights Center and East are also beyond the DFE's reach. The district court's summary rejection of these claims was an error of law.

In both general federal tort and admiralty cases, the Government is immune from suit for harm arising from some discretionary acts. The DFE is intended to prevent judicial second-guessing of some important policy-based governmental decisions, but it may not be used to create inconsistent liabilities between private and government employees performing identical acts. 28 U.S.C. § 2680(a). *Marlys Bear Med. v. U.S. ex rel. Sec'y of Dep't of Interior*, 241 F.3d 1208 (9th Cir. 2001). The DFE is not meant to provide immunity for errors made in implementing a plan the Government exercised its discretion to undertake. *Hurd v. United States*, 134 F. Supp. 2d 745, 768 (D.S.C. 2001), *aff'd*, 34 F. App'x 77 (4th Cir. 2002) *citing Huber v. United States,* 838 F.2d 398, 400–01 (9th Cir. 1988) ("once the Coast Guard exercises discretion and makes a decision … **it is obligated to use due care**.") (emphasis added).

The Government asserted the DFE extensively, arguing it applies to nearly all

of its actions in operating the dike's lighting system. (JA 98). However, courts reject overly broad readings of the DFE for maritime hazard warning systems. *Callas' Estate v. U.S.*, 682 F.2d 613, 621-22 (7th Cir. 1982) ("We categorically reject this suggestion that the government enjoys virtually unfettered discretion in the employment of warning devices"). While some initial planning decisions may be entitled to immunity, "the reasonableness of specific warning systems is a matter susceptible to judicial scrutiny." *Id.* at 622.

While the DFE analysis can be intricate, the district court reached its conclusion by asking the fundamental question of whether the conduct Barnett challenged was actually a matter for which the Government has discretion. (JA 101-102). The DFE did not apply to any portion of Barnett's claims alleging negligent maintenance of the dike's lighting system because navigational aid maintenance is not a discretionary matter. (JA 101) ("the decision to maintain lights and aids to navigation on the dike was not discretionary but rather had explicit requirements per federal statutes and regulations"). Aids to navigation must be "maintained to a reasonable degree of reliability" (62 C.F.R. § 62.21(f)), and the Coast Guard has duties to warn and to take corrective action when any navigational aid has a "discrepancy" from this standard. 62 C.F.R. § 62.21(g) (imposing duties to "make reasonable efforts to inform the navigator of known discrepancies, and to correct them within a reasonable period of time . . ."). Coast Guard Lt. Cmdr. Justin Heck

acknowledged this duty in his trial testimony. (JA 629) (agreeing USACE must take immediate steps to address reports of problems with lights on a contract dike).

In light of this uncontested ruling, there was no legal basis for the district court to cast aside Barnett's claims arising from flaws in Lights 49A/49 and in the candela and perceptibility of Amber Lights Center and East. Barnett presented evidence at trial to prove the Government failed to properly (1) establish and maintain Light 49A and Light 49; (2) inspect Light 49A and Light 49; (3) service Light 49A and Light 49; and (4) establish, maintain, inspect, service, and repair the Amber Lights East and Center so that they were reasonably bright and perceptible to boaters in contrast to other lights in the area. (JA 99). The district court never reached the merits of these assertions, instead limiting its duty and breach analysis to the inoperable Amber Light West. (JA 106-109). It appears the district court concluded Light 49A/49's operations and the amber light's candela and perceptibility were somehow different than the light "maintenance" issues to which it refused to apply the DFE.

There is no legal basis for this distinction. By the district court's logic, Light 49A/49's operations and the amber light's candela and perceptibility issues should also be beyond the DFE's reach because section 62.21(g)'s requirements apply just as much to candela/flash sequence failures and Light 49A/49 maintenance issues as they do to Amber Light West's problems. "Discrepancies" in a navigational aid, the trigger for section 62.21(g)'s duties to warn and take corrective action, goes well

beyond just instances where a navigational light stops illuminating. (JA 476) (Coast Guard Auxiliary member Dwaine Harris acknowledging problems with a light's flash sequence could be a "discrepancy"). Plus, just as the Government admitted its duty to check for inoperable amber lights, it also acknowledged a duty to address issues with Lights 49A/49's operations. Lights 49A/49 are federal aids to navigation (JA 356) which must be developed, established, operated, and maintained by the Coast Guard. (JA 1387). Lt. Cdr. Heck testified that the Coast Guard had the duty to ensure Light 49A was operating properly and "carrying out the purpose" of a federal aid to navigation—i.e. mariner safety. (JA 634). The Government establishing and maintaining Light 49A and Light 49 in a manner that was confusing to boaters certainly does not carry out the purpose of mariner safety.

In sum, the district court's initial error was in reducing Barnett's negligence claim to the inoperable Amber Light West. As the district court correctly determined, the Government's duty to maintain the dike's lighting system is grounded in federal regulations and breaches of that duty are not covered by the DFE. Accordingly, the district court should have considered the merits of all maintenance issues for all navigational aids in the dike's lighting system including the flaws in Lights 49A/49 and flaws in the candela and perceptibility of Amber Lights Center and East.

## 2. The district court erroneously concluded the Government did not breach its duty to maintain the contraction dike's lighting system.

Having found no immunity for maintenance errors, the district court's next task was to evaluate whether the Government acted reasonably in operating the dike's lighting system. But, the district court conducted no substantive evidentiary analysis, instead concluding as a matter of law that finding liability here would be "illogical" based on a factually-distinguishable case from over forty years ago the Government did not even cite in its defense. (JA 106-107) (citing *Magno v. Corros*, 630 F.2d 224 (4th Cir. 1980)). On the facts, the district court found there was no way Mr. Barnett could have been misled by the dike's lighting system because, whatever the system's flaws, the dike was still visible to boaters. (JA 108). That assertion is not supported by witnesses on the scene, the Government's own witnesses, or the post-allision investigation of conditions around the dike. Thus, while the district court downplays the importance of its duty and breach analysis (JA 106, JA 109), it erred in concluding the Government met its duty to maintain the dike's lighting system.

Barnett's suit is governed by general maritime law. A maritime negligence claim has the same elements the common law provides for land-based negligence causes of action. *Evergreen Int'l, S.A. v. Norfolk Dredging Co.*, 531 F.3d 302, 308 (4th Cir. 2008). At common law, negligence requires proof the defendant's legal duty was breached in a manner that proximately caused the plaintiff's claimed

damages. *Schumacher v. Cooper*, 850 F. Supp. 438, 447 (D.S.C. 1994) (citing *Shipes v. Piggly Wiggly St. Andrews, Inc.*, 238 S.E.2d 167 (S.C. 1977)). The district court correctly determined the Government's choice to establish a lighting system for the dike imposed a duty of due care in maintaining it. (JA 108) (citing *Indian Towing Co. v. U.S.*, 350 U.S. 61, 69 (1955) ("Certainly, once the government undertook to light the dike, it had a duty to not do so negligently").

The Government failed to reasonably operate and maintain the dike's lighting system in several ways. None of the dike's three amber lights could serve as a reasonable warning of the dike's presence. The Government's own statements support the finding that Amber Light West was not illuminating around the time of the allision. (JA 501-503). Additionally, Amber Light Center and Amber Light East were not depicted on the NOAA charts available to mariners. (JA 330) (Government stipulating to charting issue). The Government also failed to maintain these lights in a way that would allow them to serve their function as a safety and warning device. (JA 415) (USACE Navigation Chief Scott Glass agreeing USACE had duty to ensure lights on the dike were "operating properly, functioning properly, and serving their purpose" which was "mariner safety").

Amber Light Center and Amber Light East were not visible to boaters traveling this portion of the Cooper River. Less than a month before Mr. Barnett's death, a boater (Melody Keller) reported to USACE that none of the amber lights on

the contraction dike were visible (JA 336) ("those lights were not working"). Ms. Keller made special note of the dike's dangers because her brother-in-law had been killed in a previous allision there. (JA 335). Perceptibility issues with the amber lights were documented in the Coast Guard's official investigation of the Barnett allision. One of the first witnesses to arrive at the scene complained of the "[c]rappy seawall lighting blending in" with other lights in the area (JA 372-373). A firefighter dispatched to the scene remarked that the "visibility of [the] seawall is bad." (JA 373). Mr. Barnett's co-worker also told investigators none of the amber lights were sufficiently bright and they all blended in with background lights in the area. (JA 373-374). These sorts of lighting issues could easily render the amber lights useless by taking away a boater like Mr. Barrett's ability to see the danger the dike posed. (JA 375). Engle, a Coast Guard employee since 2011 after 31 years of enlisted service, testified that the amber lights are for the safety of novice and experienced boaters and that "there should be some changes to be able to make sure they're visible." (JA 869-870, JA 928-929).

Allowing the amber lights to remain in such disrepair was unreasonable. USCG Lt. Cmdr. Heck testified that the USACE must take immediate timely action to address problems with the lights and that it was never permissible for the Government to jeopardize mariner safety. (JA 629, JA 636). Scott Glass, a navigation chief with the USACE, testified the Government had the duty to make

sure the lights on the dike were operating properly, functioning properly, and serving their purpose of marking the dike for the mariners' awareness as they traverse the area near the dike.  (JA 415, JA 418-420)

Additionally, Light 49A is a lateral ATON classified by the Government as "Important" in the "Aid Availability Category" of Light 49A's USCG Integrated ATONIS Federal Aid Information Document. (JA 517, JA 1357). The Coast Guard ATON Manual provides that "the quick rhythm is the most conspicuous, and should be used on important lateral aids." (JA 1460). The ATON Manual defines "quick rhythm as "60 or more flashes per minute." (JA 1459). Instead of establishing Light 49A as a quick flashing light as required by the ATON Manual, the Government established it with a 4 second flash rhythm identical to Light 49 creating a source of confusion to boaters. Richard Keefauver, a BOSN in the Coast Guard, testified that "any way to mark the waterway at night, conspicuous is helpful." (JA 1215). Light 49A is a modern self-contained LED lantern preprogrammed with a number different characteristics regarding candela and rhythm that are easily changed with a TV-type remote control. (JA 1304-1305). As such, it was reasonable and feasible for the Government to establish 49A as a quick rhythm and carry out its duties and obligations to Mr. Barnett and other mariners.

The district court never weighed the evidence but instead found the holding in *Magno* would make liability here "illogical." (JA 107). However, *Magno*

considered different facts and a different claim. Factually, there was no dispute in *Magno* that the dike's sole light was functioning properly. 630 F.2d at 226. Here, all the evidence shows the lighting system's components were either inoperable, confusing, or imperceptible. The unfavorable facts in *Magno* left the plaintiff to pursue a different type of negligence theory. Since the plaintiff could not argue the existing lighting system (i.e. single, properly functioning light) was poorly operated, she was left to argue the system should have been expanded from one light to multiple lights or other warning devices. *Id.* at 227 ("a decisive issue in this case is whether the United States was under a duty to provide additional lighting . . ."). A negligence claim based on the Government's failure to expand the lighting system it has undertaken was not supported by statute or by the undertaking rule discussed in *Indian Towing*. *Magno*, 630 F.2d at 227-28.

In contrast, Barnett's claim faults the Government for maintenance and operational issues with components of the dike's *existing* lighting system. Amber Light West was inoperable, Amber Light Center and East were imperceptible, Lights 49A/49 created a confusing picture for boaters, and the Government failed to follow the standards of the ATON Manual. The Government could have addressed and eliminated all of these issues without adding a single light or other warning device to the dike. Accordingly, the district court erred as a matter of law in concluding *Magno* compels a finding of no breach in this case.

The district court misapplied *Magno* and its progeny in one other crucial way. Pursuing a negligence claim based on a voluntarily undertaken duty is proper where the plaintiff has relied on the action the defendant undertook. *Magno*, 630 F.2d at 228-29 (citing *Indian Towing*, 350 U.S. at 69).[1] The reliance requirement can be satisfied by showing the government's warning system "induc[ed] reliance on misleading navigational aids." *Faust v. U.S.*, 721 F.2d 934, 939 (4th Cir. 1983). As *Faust* expressly recognized, "When by its remedial measures the government misleads a boater and that causes an accident it is actionable under *Indian Towing*." *Id.* at 939-40.

*Callas' Estate* provides a good example of how the reliance requirement can be proved. There, the Seventh Circuit considered negligence claims by the family of a father and son who drown after their fishing boat capsized near a dam on the Mississippi River. 682 F.2d at 615. The court concluded a system of warnings at the lock and dam "was inadequate because it failed to apprise boaters . . . of the dangers awaiting them." *Id.* at 623. The warnings included flashing amber and red lights as well as a warning sign near the dam. *Id.* In operation, the lights provided "little practical guidance" to boaters. *Id.* The Government defended in *Callas' Estate* by arguing the sign and lights it provided could not have induced boaters' reliance. In

---

[1] Liability also applies when the undertaken action increases the risk of harm to the plaintiff. *Patentas v. U.S.*, 687 F.2d 707, 715 (3d Cir. 1982) (citing Restatement (Second) of Torts § 323).

rejecting that argument, the court found the warning system "lulled [boaters] into a false sense of security" because, as a result of the system's failures, boaters "ha[d] no information about the nature of the real danger." *Id.* Ultimately, the reliance requirement was met and the plaintiff successfully proved the signals were misleading because "this was a case in which the government induced reliance on a belief that it was providing something which, in fact, it was not providing—an adequate warning of the dangers posed by the dam." *Id.*

Here, the poorly maintained lighting system Mr. Barnett encountered on the dike on July 6, 2018, was misleading because it presented a very confusing image of where it was and was not safe to travel. The potential for confusion was cited by both government actors and lay witnesses at trial. Dwaine Harris, the Coast Guard Auxiliary member, testified it could be "very confusing" to interpret the lighting system and to navigate around the dike at night. (JA 471). Robert Murphy, Mr. Barnett's co-worker, testified from experience that the area around the dike was confusing to operate during nighttime hours. (JA 760). Moreover, the Coast Guard investigation concluded the identical color and flash sequence of Lights 49A and 49 were a source of confusion for boaters (JA 1342).

The district court reasoned there was no reliance here only by making unsupported factual findings. The district court's order concluded that, whatever flaws the dike's lighting system contained, the dike was "well lit" with lights that

sufficiently "indicat[ed] the presence of the dike on the night of the collision." (JA 108). The evidence presented at trial does not support these findings. Firefighters arriving shortly after the allision described the lighting as "crappy," "dark," "unlit," and "bad." (JA 372-37, JA 1689-1692). Mr. Barnett's supervisor described for investigators how the dike "was not well lit" and his belief that lighting issues contributed to the history of allisions at the site. (JA 374-735, JA 1683). Murphy testified that the overall lighting at the dike was "pathetic" and "unacceptable" with any light emanating from the dike too dim and indistinguishable to effectively warn boaters of the dike's presence. (JA 373-374, JA 759-761, JA 1681). Crucially, Bryan Johnson, the Coast Guard's investigator for this allision, did not dispute any of these reports. (JA 373-374).

In sum, the district court should have ruled Barnett met her burden on the duty and breach elements of her negligence claim. The district court correctly concluded the Government had a duty to light the dike in a reasonable manner. (JA 108). The district court erred in finding no breach of this duty because it relied on a misconstruction of distinguishable precedent (*Magno*) rather than evaluating the overwhelming evidence showing maintenance issues rendered multiple components of the dike's existing lighting system confusing and unfit for their fundamental purpose of warning boaters of the dike's dangers.

3. **The district court's causation analysis failed to consider the full scope of the Government's negligence and improperly applied key fault allocation principles.**

The fundamental dispute in this case centers on the degree to which the allision was the product of the Government's mismanagement of the dike's lighting system or Mr. Barnett's alleged inattention as a mariner. As discussed above, the district court erroneously applied the DFE to cast aside most of the Government's negligence. In its causation analysis, the district court further erred by misapplying various fault allocation principles (superseding cause, *The Pennsylvania* rule, and *The Oregon* rule) to Mr. Barnett's conduct.

a. **Any negligence by Mr. Barnett is not the extraordinary, unforeseeable intervening act required to qualify as a superseding cause.**

When the conduct of two or more parties contributed to a maritime collision, liability for the resulting losses is allocated among the parties "proportionately to the comparative degree of their fault." *Curtis Bay Towing Co. v. The M/V Md. Clipper*, 599 F.2d 1313, 1315 (4th Cir. 1979) (citing *U.S. v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 411 (1975)). The rule of *Reliable Transfer* installed a rule of "pure" comparative fault for admiralty cases. *Pan-Alaska Fisheries, Inc. v. Marine Constr. & Design Co.*, 565 F.2d 1129, 1133 (9th Cir. 1977). *Reliable Transfer*'s holding did not prevent courts from recognizing a superseding cause. *Exxon Co., USA v. Sofec, Inc.*, 517 U.S. 830, 837 (1996). However, the district court incorrectly concluded

Mr. Barnett's actions were a superseding cause of the allision here, and it should have instead evaluated and apportioned the parties' comparative degree of fault.

Superseding cause is a means for finding a party's negligent conduct was ultimately not a proximate cause of the claimed damages because between that negligence and the injury there arose "a later cause of independent origin that was not foreseeable." *Id.* (quoting 1 T. Schoenbaum, Admiralty and Maritime Law § 5-3 p.. 165-66 (2d ed. 1994)). Traditionally, this doctrine is limited to actions by some third party. *Rawl v. U.S.*, 778 F.2d 1009, 1015 (4th Cir. 1985). Even then, a superseding cause is a rare thing. In all but the extraordinary case, disputes over how much each party is to blame is addressed by comparing and apportioning fault. *Id.* at 1016 (defining superseding cause narrowly as an "entirely unforeseeable and unexpected force"); *Tidewater Marine, Inc. v. Sanco Int'l, Inc.*, 113 F. Supp. 2d 987, 999 (E.D. La. 2000) (limiting doctrine to intervening negligence "so extraordinary that a reasonably prudent person could not have foreseen its occurrence").

Mr. Barnett's conduct is not the extraordinary case *Rawl* contemplates. The district court faulted Mr. Barnett for the allision in two ways—deviating from the navigational channel and failing to use the Miss June's GPS chart plotter. (Order at 27). The district court's reliance on the failure to use the Miss June's GPS chart plotter is problematic because the dike did not appear on the plotter. (JA 368). For Barnett's conduct to rise to the level of a superseding cause, the harm it allegedly

caused would need to be "different in kind" from that which naturally flows from the Government's misconduct. *Rawl*, 778 F.2d at 1016; Restatement (Second) of Torts § 442. Considering the full scope of the Government's negligence, that standard is not met here. The Government's failure to properly establish, maintain, and operate the dike's lighting system meant that Amber Light West was inoperable, Amber Light Center and East were imperceptible, Lights 49A/49 presented a confusing picture to mariners like Mr. Barnett, and Light 49A had an improper flash characteristic to alert boaters of a danger. The natural and probable consequence of that negligent conduct is that boats approaching the dike may alide with it because they cannot see it or are unable to process its confusing lighting system. Mr. Barnett's conduct and this result was not the type of extreme unexpected and unforeseeable intervention that forms a superseding cause. *Rawl*, 778 F.2d at 1016 (holding that a superseding cause must be "a force or actor wholly outside of the circumstances of the original negligence").

Mr. Barnett's conduct was not unforeseeable to the Government. Mariners, including those with the Coast Guard and USACE, routinely leave the channel for many reasons, including to return to a dock. The subject dike is in the direct vicinity of the dock of Mr. Barnett's employer. Because Mr. Barnett had completed his work mission prior to the allision, it is reasonable to infer Mr. Barnett was returning to the Moran dock, which necessitated him to leave the channel (a channel marked with

ATONs that caused boater confusion and with an improper flash characteristic). Looking at the totality of the facts and circumstances, the reasonable inference from the evidence is that the cause of the allision was Mr. Barnett being induced by the Government to rely on misleading and improper navigational aids established and maintained by the Government.

Mr. Barnett's nonuse of the GPS chart plotter also fails to qualify as a superseding cause. Mr. Barnett's employer did not require its boat operators to use the GPS chart plotter (JOA 732) and OSHA's investigation established no violations. (JA 582). Even if Mr. Barnett can be faulted for not using the GPS chart plotter, at least one court has held that a similar failure does not rise to the level of a superseding cause. *Tidewater Marine*, 113 F. Supp. 2d at 1003 (rejecting superseding cause argument because "it is not highly extraordinary for a vessel's captain to fail to check [navigational] charts"). Finally, the district court erred in its reliance on *Vollmar v. O.C. Seacrets, Inc.*, 831 F. Supp. 2d 862, 869 (D. Md. 2011). The district court reasoned Mr. Barnett's actions were a superseding cause because *Vollmar* found a superseding cause based on fog and the absence of radar. (Order at 28). However, *Vollmar*'s holding was less about the weather and radar and more about the fact that the boat's driver was "conspicuously intoxicated" and the boat's other occupants acquiesced to him operating the boat anyway. *Vollmar*, 831 F. Supp.

2d at 869. Nothing like that is even alleged here as an autopsy established Mr. Barnett was not under the influence of drugs or alcohol. (JA 1630-1632).

In sum, the district court erred in concluding Mr. Barnett's conduct was a superseding cause of the allision. Mr. Barnett's deviation from the navigational channel and failure to use a GPS device is not the type of extraordinary, unforeseeable, and "different in type" conduct that severs the Government's negligence from Barnett's damages.

### b. The district court misapplied the rules from *The Pennsylvania* and *The Oregon*.

This appeal implicates two common law burden-shifting presumptions invoked when a moving vessel allides with a stationary object. First, the *Oregon* Rule creates a rebuttable presumption of fault against a moving vessel that, under its own power, allides with a visible stationary object. *The Oregon,* 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943 (1895). "This presumption of negligence may be rebutted by showing, by a preponderance of the evidence, the allision was the stationary object's fault, the moving vessel acted with reasonable care, or the allision was an unavoidable accident." *Bunge Corp. v. Freeport Marine Repair,* 240 F.3d 919, 923 (11th Cir.2001); see also *Superior Constr. Co. v. Brock*, 445 F.3d 1334, 1339–40 (11th Cir. 2006).

Second, under the *Pennsylvania* Rule,

> [W]hen ... a ship at the time of a[n allision] is in actual violation of a statutory rule intended to prevent [allisions], it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the vessel of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.

*The Pennsylvania*, 86 U.S. 125, 136, 22 L. Ed. 148 (1873). The *Pennsylvania* Rule "is not a rule of liability, but shifts the burden of proof as to causation. This burden is strict, but it is not insurmountable" and "in *The Pennsylvania* the Supreme Court 'did not intend to establish a hard and fast rule that every vessel guilty of a statutory fault has the burden of establishing that its fault could not by any stretch of the imagination have had any causal relation to the collision, no matter how speculative, improbable or remote.'" *Orange Beach Water, Sewer, & Fire Prot. Auth. v. M/V Alva*, 680 F.2d 1374, 1381 (11th Cir. 1982) (citing *Compania de Maderas de Caibarien, S. A. v. The Queenston Heights*, 220 F.2d 120, 122-123 (5th Cir.), cert. denied, 350 U.S. 824, 76 S.Ct. 52, 100 L.Ed. 736 (1955).[2]

### i. Barnett rebuts the *Oregon* presumption.

In this case, the Miss June operated by Mr. Barnett allided with the stationary dike and the Government sought to apply the *Oregon* Rule. The *Oregon* Rule is most

---

[2] See also I*nter-Cities Navigation Corp. v. United States*, 608 F.2d 1079 (5th Cir. 1979*); China Union Lines, Ltd. v. A. O. Andersen & Co.*, 364 F.2d 769 (5th Cir. 1966), cert. denied, 386 U.S. 933, 87 S.Ct. 955, 17 L.Ed.2d 805 (1967); *Parker Brothers & Co. v. De Forest*, 221 F.2d 377 (5th Cir. 1955); accord The YFNX-6, 156 F.Supp. 325 (D.Md.1957), aff'd sub nom *Gosnell v. United States*, 262 F.2d 559 (4th Cir. 1959).

often applied to establish a presumption of fault where the owner of the stationary object sues the owner of the alliding vessel rather than as a comparative defense. The district court concluded, "[c]onsequently, the government's citation to the Oregon Rule presents a somewhat novel application given that the government is the defendant and the owner of the stationary object; for that reason, the court analyzes the Oregon Rule under affirmative defenses." (JA 117). The district court cited *Am. Tel. & Tel. Co. v. Steuart Transp. Co.*, 1978 A.M.C. 1680 (D. Md. 1977), a case that found the defendant wholly at fault for striking and damaging the plaintiff's underwater telephone cables because the defendant's vessel was operating "'outside the channel in an area where there was not sufficient water to navigate.'" (JA 118).

In its "novel application" in the subject action, the district court applied the *Oregon* presumption of fault in favor of the Government even though this action is factually distinguishable from the *Am. Tel. & Tel. v. Steuarat Transp. Co*. decision. The Government is the defendant and Barnett had plenty of water to safely navigate outside the channel with depths up to 24 feet. (JA 526). Furthermore, the Government admittedly created a confusing environment by establishing Light 49A and Light 49 with the same flash sequence and did not account for background lighting with respect to the lights affixed to the dike. The lights affixed to the dike were also not serving their purpose of marking the contraction dike at the time of the allision. As such, Barnett sufficiently rebutted the *Oregon* presumption.

### ii. The *Pennsylvania* Rule should not apply to Barnett.

Generally, the party seeking to apply the *Pennsylvania* Rule has the burden of proving the statutory violation. By its own terms, the *Pennsylvania* Rule applies only if the Government has shown by a preponderance of the evidence that Barnett committed a statutory violation.

The district court correctly acknowledges the *Pennsylvania* Rule does not bar negligence claims. (JA 113, JA 116). However, the district court raised the application of the *Pennsylvania* and *Oregon* Rules *sua sponte* and did not properly apply the interplay between the two Rules. In short, the burden of proof initially rests with Barnett as the moving vessel under the *Oregon* Rule. Because Barnett can establish the stationary obstruction violated a statutory rule intended to prevent allisions, then the *Pennsylvania* Rule shifts the burden to the Government. *Sunderland Marine Mutual Insurance Co. v. Weeks Marine Construction Co.* 338 F.3d 1276, 1279 (11th Cir.2003) (citations omitted); *see also Parker Towing Co. v. Yazoo River Towing, Inc.,* 794 F.2d 591, 594 (11th Cir.1986); *Orange Beach,* 680 F.2d at 1380–81. *Superior Const. Co. v. Brock*, 445 F.3d 1334, 1340 (11th Cir. 2006).

Generally, if both parties in an allision have been shown to be in statutory fault, and if the court finds both parties are at fault, the *Pennsylvania* Rule has been applied to both. An example is found in *Commercial Transport Corp. v. Martin Oil*

*Service, Inc.* where each party had some level of statutory fault. 374 F.2d 813, 819 (7th Cir. 1967). Therefore, the next question to be determined was the proper measure of damages. In *Commercial Transport Corp*, one party violated the Coast Guard regulations by failing to notify the Coast Guard that it had developed a leak in one of its tanks. *Id.* The other party also violated the same regulations by failing to have a licensed tanker man on hand at the time of unloading. *Id.* This negligence of both parties resulted in a fire, and neither party could succeed in meeting its burden under the *Pennsylvania* Rule. Since the fire was of unknown origin, the court divided the damages evenly. *Id.*

### iii.    The Pennsylvania Rule applies to the Government.

Although the *Pennsylvania* Rule was originally directed at vessels, courts have also applied it to those who do not properly mark an object in navigable waters. *Matter of Complaint of Foss Mar. Co.*, 114 F. Supp. 3d 452 (W.D. Ky. 2015). The *Pennsylvania* Rule applies to the Government because it violated 14 U.S.C. § 102 by failing to enforce the standards of the ATON Manual. Section 102 provides that the Coast Guard "shall … enforce regulations for the promotion of safety of life and property on and under the high seas and waters subject to the jurisdiction of the United States." The ATON Manual includes the directive that "Area and District Commanders, commanders of maintenance and logistics commands, and unit Commanding Officers shall ensure that the provisions of the Manual are followed."

(JA 1376). Lt. Cmdr. Heck testified that the Coast Guard and the USACE must abide by the ATON Manual at all times, without exception. (JA 638). In its Order, the district court acknowledged "[t]he Coast Guard and the Army Corps have conceded that they have no discretion or choice but to comply with the Aids to Navigation Administration Manual." (JA 101).

Regarding Light 49A, the Government violated section 102 by not establishing it pursuant to the standards of the ATON Manual. Light 49A is a lateral ATON classified by the Government as "Important" in the "Aid Availability Category" of Light 49A's Coast Guard Integrated ATONIS Federal Aid Information Document. (JA 517, 1357). The ATON Manual provides that "the quick rhythm is the most conspicuous, and should be used on important lateral aids" (JA 1460). The ATON Manual defines "quick rhythm" as "60 or more flashes per minute." (JA 1459). Richard Keefauver, a BOSN in the Coast Guard, testified that "any way to mark the waterway at night, conspicuous is helpful." (JA 1215). In concurrence with 14 U.S.C. § 102, Brian Hall, the Government's maritime expert witness, testified it was "absolutely" a fundamental duty of the Government to carry its job in a safe manner. (JA 544).

Instead of establishing Light 49A as a quick flashing light as required by the ATON Manual (and 14 U.S.C.A. §102), the Government established it with a 4 second flash rhythm identical to Light 49 creating a source of confusion to boaters.

Light 49A's preprogrammed rhythm and candela options are easily changed with a TV-type remote control. (JA 1304-1305). As such, it was an easy task for the Government to establish and maintain  Light 49A as quick rhythm aid as required by 14 U.S.C § 102 and the ATON Manual.

The Government also violated 14 U.S.C. § 102 with respect to the USACE's 2011 PATON Application, which was approved to affix lights to the dike (JA 1627-1628). The Government's failure to properly install, inspect, and maintain the lights in compliance with the 2011 PATON Application triggers the application of the *Pennsylvania* Rule pursuant to *American Zinc Co. v. Foster*, 313 F.Supp. 671 (S.D.Miss.1970), modified on other grounds, 441 F.2d 1100 (5th Cir.), cert. denied, 404 U.S. 855, 92 S.Ct. 99, 30 L.Ed.2d 95 (1971); accord *In re Wasson*, 495 F.2d 571, 579 (7th Cir.), cert. denied, 419 U.S. 844, 95 S.Ct. 78, 42 L.Ed.2d 73 (1974). *Orange Beach Water, Sewer, & Fire Prot. Auth. v. M/V Alva*, 680 F.2d 1374, 1383 (11th Cir. 1982) (holding the failure to comply with a permit issued by the Army Corps triggers the application of the *Pennsylvania* Rule).  Although the Government may not have been required to submit a Private Aids to Navigation Application, it voluntarily did so. (JA  328 and  1331). The 2011 Application specifically provides, "NECESSITY FOR AID… REQUIRED TO MARK CONTRACTION DIKE." (JA 1331). As the owner of the lights affixed to the dike, the Government was "supposed to clearly maintain" the lights in the manner noted on the Application (JA 942).

However, the Government failed to do so as established by the on scene witnesses' description of the lights being woefully insufficient to "MARK THE CONTRACTION DIKE" pursuant to the Application. The Government also failed to include the lights on the NOAA charts as it was required to do (JA 56).

The Government also violated 14 U.S.C. § 102 by not conducting regular inspections of the lights affixed to the dike. Lt. Cmdr. Heck testified that the ATON Manual required regular inspection of the lights affixed to the dike. (JA 633). Lt. Cmdr. Honderd testified that the Government had the duty to maintain and inspect the lights affixed to the dike on a regular basis. (JA 1026-1027). The Government stipulated that it did not conduct regular maintenance of the lights affixed to the dike between 2011 and the Barnett allision in July of 2018 and that the Government did not conduct verification or inspection of the lights affixed to the dike between February 2014 and the Barnett allision. (JA 329-330).

### 4. Barnett's post-trial motions did not revive the Government's right to pursue costs that it waived by failing to make a timely filing.

The Government filed a bill of costs 265 days after the only "judgment" ever entered in this case. The district court concluded this filing was timely or, in the alternative, Government counsel's error was the type of excusable neglect that permits a late filing. Neither of those rulings are supported by law.

The district court made its substantive ruling on Barnett's claims in its January 10, 2023, "Findings of Fact and Conclusions of Law." (JA 84-124). Judgment in the

Government's favor was entered on February 7, 2023. (JA 126). Barnett filed timely post-trial motions on March 7, 2023. (JA 127-133) (citing Fed. R. Civ. P. 52(b), 59(e), and 60(b)). The Government, at least tacitly acknowledging its deadline for pursuing costs had long past, moved on July 31, 2023, for leave to make an untimely filing. (JA 247-250) (citing Fed. R. Civ. P. 6(b)(1)). The district ruled on both motions on October 25, 2023 (JA 258-267), and the Government finally filed a bill of costs on October 30, 2023. (JA 268-269). No other "judgments" were ever entered by the district court in this litigation.

The Government's bill of costs was untimely. The district court's local rules require a bill of costs be filed by the Federal Rules of Civil Procedure deadline for seeking attorney's fees. D.S.C. Local Rule 54.03 (citing Fed. R. Civ. P. 54(d)(2)(B)). Rule 54(d)(2)(B) sets the filing deadline at "14 days after the entry of judgment." Failure to meet this deadline waives any pursuit of costs. D.S.C. Local Rule 54.03 ("Noncompliance with this time limit shall be deemed a waiver of any claim to costs"). Here, "entry of judgment" occurred on February 7, 2023, which meant the Government's deadline for filing a bill of costs was February 21, 2023. The Government's October 30, 2023, filing missed that deadline and was untimely. The Government has never disputed this point. Its motion for leave of court expressly and solely relied on Fed. R. Civ. P. 6(b)(1), a provision seeking to make a filing "after the time has expired." (JA 248). Practically speaking, there would have been

37

no need to seek leave and argue "excusable neglect" if the Government believed its deadline had not yet expired.

Despite this, the district court concluded the Government need not prove "excusable neglect" because its time period for seeking costs had not yet arisen. (JA 267) (citing *CX Reinsurance Co. v. Johnson*, 977 F.3d 306, 314-15 (4th Cir. 2020)). *CX Reinsurance* held post-trial motions can "suspend the finality of the district court's judgment" and affect the time period for a prevailing party to seek costs. 977 F.3d at 314 (citing *Bailey v. Cnty. of Riverside*, 414 F.3d 1023, 1025 (9th Cir. 2005)). But *CX Reinsurance* does not hold or suggest the bill of costs was timely under the circumstances presented here. That is because the Government's deadline for seeking costs **expired before Barnett's post-trial motions were ever filed**. The clerk's February 7, 2023 "Judgement" filing was an "entry of judgment." Fed. R. Civ. P. 58(b)(1), (c)(2). The Government's deadline for seeking costs elapsed 14 days later on February 21, 2023. At that moment, the Government had waived its right to seek costs. That waiver was in place for a full 14 days before Barnett filed timely post-trial motions.[3]

---

[3] Barnett moved under Fed. R. Civ. P. 52(b) and Fed. R. Civ. P. 59(e), both of which are permitted at any time within 28 days of entry of judgment. Barnett's other post-trial motion was filed pursuant to Fed. R. Civ. P. 60(b), which is timely if filed within one year of entry of judgment. Fed. R. Civ. P. 60(c)(1).

Under these circumstances, the effect of the district court's ruling was to find Barnett's decision to file post-trial motions somehow revived a right to pursuit costs the Government had waived two weeks earlier. The district court cites no authority for that principle. *CX Reinsurance* certainly does not require that conclusion because there was no entry of judgment in the docket in that case as there is here. 977 F.3d at 309 (noting "the civil docket does not indicate the entry of any 'judgment'" prior to the motion for attorney fees). Under the plain language of Rules 54 and 58 (and Local Rule 54.03), the Government's right to pursue costs was gone by February 21st, and Barnett reasonably relied on that straight-forward application of the rules when she sought post-trial relief on March 7th. Allowing the district court's ruling to stand would mean accepting the notion that voluntarily waived rights can be revived without explanation or mitigating circumstances and that Barnett's reliance on the rules should cost her $ 9,570.90. In sum, the district court ruling the Government's pursuit of costs was timely is both unreasonable and an error of law. The Government should not have been allowed to pursue costs out of time without at least meeting Rule 6(b)(1)(B)'s high bar of "excusable neglect."

The Government's explanation for its delay falls far short of that bar. "Excusable neglect" is not easily demonstrated and never applies to a lack of diligence by a party or its attorney. *Thompson v. E.I DuPont de Nemours & Co., Inc.*, 76 F.3d 530, 533-34 (4th Cir. 1996) (finding rulemakers anticipated this

standard would only be met in "extraordinary cases"); *Robinson v. Wix Filtration Corp., LLC*, 599 F. 3d 403, 414 (4th Cir. 2010). Courts should consider a number of factors to evaluate a party's failure to meet its deadline including (1) the danger of prejudice to its opponent; (2) the length of the delay; (3) the potential impact of the delay on judicial proceedings; (4) the reason for the delay; (5) whether it was within the reasonable control of the movant; and (6) whether the movant acted in good faith. *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993). The district court failed to consider any of these factors before concluding the Government's failure was excusable. The district court's entire ruling on this point was just one sentence. (JA 267).

Had the district court completed the required analysis, its factors do not support relief. The most important *Pioneer* factor is the reason why the party failed to meet its deadline. *Thompson*, 76 F.3d at 534 (citing *Weinstock v. Cleary, Gottlieb, Steen & Hamilton*, 16 F.3d 501, 503 (2d Cir. 1994)). The Government's only explanation was that one of its attorneys was confused about the rules' operation. (JA 248-249) (arguing counsel had an "incorrect understanding" of the time period for pursuing costs). This explanation does not qualify as excusable neglect for several reasons. First, this Court has previously held "inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable neglect.'" *Thompson*, 76 F.3d at 533 (quoting *Pioneer*, 507 U.S. at 392).

Second, the Government never explained how one of its attorneys misunderstanding the rules led the Government's entire legal team to disregard the filing deadline. Three other attorneys are listed as the Government's counsel in the motion for leave and an additional two were attorneys of record at trial. Third, the one Government attorney's misunderstanding of the district court's local rules is not mitigated in any way by the fact that he was admitted to the district on a *pro hac vice* basis. That attorney agreed to comply with the local rules in his application for *pro hac vice* admission. Thus, similar to *Thompson*, the Government's failure here was "nothing more than inexcusable run-of-the-mill inattentiveness by counsel" that does not meet Rule 6(b)(2)(B)'s high bar. 76 F.3d at 535.[4]

Accordingly, the district court's rulings on costs should be reversed. The district court's finding that the Government met the bill of cost deadline—an argument the Government did not even make for itself—overlooks the crucial fact that the Government waived its right to seek costs before Barnett ever filed post-trial motions. There is no legal authority for the notion that Barnett's motion negated that waiver and, therefore, no way for the Government to pursue costs without proving

---

[4] Other *Pioneer* facts also weigh against relief. The Government's delay was substantial. The motion for leave was filed 159 days after the bill of costs deadline elapsed, and the actual bill of costs was not filed for another three months. Plus, the Government cannot dispute that avoiding the error was within its control. All it would have taken to avoid the error would have been one member of the large team of experienced Government trial attorneys or their support staff to calendar the deadline and to file a bill of costs in a timely manner.

"excusable neglect." The district court's ruling on that ground was flawed both because of its lack of substance and because a Government attorney's ignorance of the rules is not excusable under existing law.

**5. The district court erred in refusing to take judicial notice of a Coast Guard publication.**

Barnett properly presented for judicial notice important facts from two documents: (1) the Coast Guard's "Local Notice to Mariners" for District 7 Week 18/07 ("Local Notice"); and (2) a local news report documenting an additional allision by a boater with the dike. The district court erred in concluding Barnett failed to establish the judicial notice requirements for each document.

The Federal Rules of Evidence provide for judicial notice of an "adjudicative fact" that is "not subject to reasonable dispute." Fed. R. Evid. 201(a)-(b). A court can utilize judicial notice *sua sponte* but is required to take judicial notice of the designated fact if a party requests it and makes the required showing that the fact is beyond reasonable dispute. Fed. R. Evid. 201(c). Public records and government documents are among the likely sources for facts appropriate for judicial notice. *Phillips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *U.S. ex rel. Dingle v. BioPort Corp.*, 270 F. Supp. 2d 968, 972 (W.D. Mich. 2003) (quoting *Jackson v. City of Columbus*, 197 F.3d 77, 745 (6th Cir. 1999) (finding that public records and government documents are generally considered not to be subject to reasonable dispute). Courts have also applied judicial notice to various extents for

some administrative agency reports. *Mack v. South Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986) (quoting *Interstate Natural Gas Co. v. S. Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953) (court may take judicial notice of "records and reports of administrative bodies")).

The Local Notice falls squarely within the type of documents for which judicial notice is proper. Barnett presented the Local Notice for its documentation of the Coast Guard's installation of three key lights (Amber Light West, Amber Light Center, and Amber Light East) on the dike. (JA 172) (citing JA 65). The Government undertaking responsibility for installing the lights and its continuing duty to maintain them are crucial issues in this case. Moreover, documents issued and maintained by the Coast Guard have been deemed appropriate sources for judicially noticed facts in the past. *See e.g. Massachusetts v. Westcott*, 431 U.S. 322, 323 n. 2 (1977) (taking judicial notice of Coast Guard licensing records). Courts have also taken judicial notice of statements published in periodic bulletins and circulars issued by the Coast Guard. *Donovan v. Red Star Marine Servs., Inc.*, 739 F.2d 774, 777 (2d Cir. 1984) (taking judicial notice of Coast Gard's "Navigation and Vessel Inspection Circular" from June 1982); *Evanston Ins. Co. v. AmSpec Holding Corp.*, 495 F. Supp. 3d 485, 488 n. 19 (S.D. Tex. 2020) (taking judicial notice Coast Guard bulletins on port conditions after finding they are "highly indisputable public records").

## CONCLUSION

For the reasons stated above, Barnett respectfully requests the court reverse the district court's rulings. At the outset, the district court improperly restricted Barnett's claim by misconstruing the DFE's scope and refusing to consider all of the maintenance and operational errors in the dike's lighting system. Additionally, the district court's breach analysis not only overlooked issues with Amber Light Center, Amber Light East, and Lights 49A/49, it also relied on the notion that the dike was "well lit" when both disinterested witnesses and the Government's own investigation proved otherwise.

Moreover, after failing to identify the existence and scope of the Government's breaches, the district court then embarked on a conclusory causation analysis laying all blame at Mr. Barnett's feet. While Mr. Barnett was not blameless, the overwhelming evidence at trial showed the Government's errors were also a proximate cause of the allision. Finally, even if the Government prevails on the merits, the district court erred in allowing the Government to pursue costs after the it waived any right to do so. Accordingly, the district court's rulings should be reversed and this matter remanded for further proceedings.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 34(a), Barnett requests oral argument in this matter. Due to the parties' sharp disagreements on the applicable facts and law as well as

the effect of this issue on boater safety in the Cooper River and future admiralty claims, Barnett believes oral argument will benefit the Court in clarifying the disputed issues.

Respectfully submitted,

/s/ Jordan C. Calloway
Brooklyn A. O'Shea
Christopher J. McCool
O'Shea Law Firm, LLC
1120 Folly Road
Charleston, SC 29412
(843) 805-4943
brooklyn@oshealaw.com
chris@oshealaw.com

Jordan C. Calloway
McGowan, Hood, Felder & Phillips, LLC
1539 Health Care Drive
Rock Hill, SC 29732
(803) 327-7800
jcalloway@mcgowanhood.com

Attorneys for Appellant

Rock Hill, SC
February 20, 2024

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 23-2221    **Caption:** Barnett v. United States of America

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

☐ this brief or other document contains ___10,497___ [*state number of*] words

☐ this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

☑ this brief or other document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 [*identify word processing program*] in Times New Roman 14 pt. [*identify font size and type style*]; **or**

☐ this brief or other document has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) /s/ Jordan C. Calloway

Party Name Appellant Penny Jo Barnett

Dated: February 20, 2024